1   Joseph Martin McGhee
    P.O. Box 91
2   Flagstaff, AZ 86002
    Tel: (928) 600-0954
3   mcghee.v.city.of.flagstaff.et.al@gmail.com

4   Plaintiff, *in Pro Per*

5

6               IN THE UNITED STATES DISTRICT COURT

7                   FOR THE DISTRICT OF ARIZONA

8   Joseph Martin McGhee,                    No. 3:20-cv-08081-GMS

9              Plaintiff,                     **MEMORANDUM OF POINTS AND
                                              AUTHORITIES IN SUPPORT OF
10        vs.                                 PLAINTIFF'S EMERGENCY *EX
                                              PARTE* APPLICATION FOR
11  The City of Flagstaff; Coral Evans, Sued in   TEMPORARY RESTRAINING
    her Official Capacity as Mayor of the City of  ORDER WITHOUT NOTICE and
12  Flagstaff; Doug Ducey, Sued in his Official   MOTION FOR PRELIMINARY
    Capacity as Governor of the State of Arizona,  INJUNCTION.**

13
              Defendants.                     Assigned to the Hon. G. Murray Snow
14

15

16                      I.    **ISSUES PRESENTED**

17        1.    Whether or not Governor Ducey's Executive Order #2020-18 violates the

18  Fifth and Fourteenth Amendments of the United States Constitution.

19        2.    Whether or not Governor Ducey's Executive Order #2020-18 is a *per se*

20  quarantine.

21                      II.   **INTRODUCTION**

22            *"Ignorance is the parent of fear."* — Herman Melville

23  **A.    COVID-19 Is A Pandemic**

24        There can be no doubt that COVID-19 has spread around the world and to include

25  Flagstaff – it has become a pandemic. There can likewise be no doubt that there is

26  intense widespread fear, arguably bordering on mass panic and hysteria, over this spread.

27

28

1   The word "pandemic" is inherently frightening –  conjuring images of millions

2   dead around the world, as in the 1918 Spanish Flu Pandemic. Nevertheless, the word

3   only means: occurring over a wide geographic area and affecting an exceptionally high

4   proportion of the population.[1]  "Pandemic" does not in fact refer to any particular

5   designation of potential for harm or lethality inherent to this distribution geographic

6   distribution – it is merely a description of *prevalence.*

7   **B.      There Is Another Ongoing Pandemic Of A Dangerous Infectious Disease**

8   Fear is a natural reaction when confronted with a *perceived* threat to one's life.

9   Being repeatedly warned that there is a rapidly-spreading and highly-lethal virus which

10   is uncontrolled and unconstrained is scary. When these warnings are accompanied by the

11   assertion that 3.4% of everyone – man, woman, and child – who contracts this virus will

12   ***die***, infection with COVID-19 becomes an absolute terrifying prospect. (Exhibit 1)

13   If this 3.4% mortality rate is accurate then when all is said and done and COVID-

14   19 has come and gone from Flagstaff, at least one Macy's employee, at least seven

15   workers at Fry's, at least 75 employees at Flagstaff Medical Center, at least 500 of

16   Flagstaff's children, at least 1074 Northern Arizona University students and staff, and at

17   least 12,000 members of the Navajo Nation, will have died from COVID-19 infection.

18   This is indeed a horrific prospect and certainly one that, if true, the entire community

19   should prepare for and attempt to mitigate through any and all reasonable and necessary

20   means.

21   But this 3.4% statistic (and others like it) is simply not accurate – not even

22   remotely. Moreover, even if this statistic were statistically accurate, it is *highly-*

23   *misleading* in that it groups all COVID-19 deaths together into one collective "mortality

24   rate." Worse yet, it lacks any contextual value as to the risk-factors which are relevant in

25

26   _____

27   1      "Pandemic" Merriam-Webster.com Dictionary, Merriam-Webster,
https://www.merriam-webster.com/dictionary/extreme, Accessed April 23, 2020.

28

1    calculating this mortality rate, let alone where such figure has been scientifically-
2    validated.

3        This misuse of a mortality statistic is analogous to conflating rates of drunk-
4    driving fatalities with fatalities from non drunk-driving accidents because they both
5    occur with automobiles. Obviously drunk-driving presents an overall risk of automobile
6    accident fatality which is orders of magnitude greater than that non drunk-driving, and it
7    would be – for lack of a better word – silly, to conflate these two independent variables
8    of traffic fatality risk. Analysis devoid of any meaningful foundation, point of reference,
9    or context, is methodologically unsound – the statistician's way of stating that it's useless
10   and lacks any descriptive value. Any data from such an analysis is essentially worthless
11   – "garbage in, garbage out" as the statistical euphemism goes.

12   **C.    COVID-19: Unscientific Data – 6.9% Mortality Rate**

13       As of April 23, 2020, the World Health Organization, ("WHO"), reports 2.54
14   million "laboratory confirmed" Covid-19 cases with 175,694 deaths – a 6.9% mortality
15   rate. The U.S. Centers for Disease Control, ("CDC"), reports 828,441 total cases with
16   46,379 deaths – a 5.6% mortality rate.

17       **1.    WHO Covid-19 Infection And Mortality Reports Are <u>Not Credible</u>**

18       Because the WHO, (Exhibit 2), and CDC, (Exhibit 3),  use essentially identical
19   criteria to diagnose and "confirm" Covid-19 infections and deaths, only the WHO
20   criteria will therefore be subject to analysis.

21           **a.    WHO Definition: "Covid-19 Death"**

22       "COVID-19 death is defined for surveillance purposes as a death resulting from a
23   clinically compatible illness in a probable or confirmed COVID-19 case, unless there is a
24   clear alternative cause of death that cannot be related to COVID disease (e.g. trauma).
25   There should be no period of complete recovery between the illness and death." (Exhibit
26   2, pg. 12)

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**b.      WHO Definition: "Probable Case" (Covid-19)**

"A suspect case for whom testing for the COVID-19 virus is inconclusive … Inconclusive being the result of the test reported by the laboratory; <u>OR</u> A suspect case for whom testing could not be performed for any reason ." (Exhibit 2, pg. 12)

**c.      WHO Definition: "Suspect Case" (Covid-19)**

"A patient with acute respiratory illness (fever and at least one sign/symptom of respiratory disease, e.g., cough, shortness of breath); <u>AND</u> a history of travel to or residence in a location reporting community transmission[2] of COVID-19 disease during the 14 days prior to symptom onset … <u>OR</u> [a] patient with any acute respiratory illness AND having been in contact with a confirmed or probable COVID-19 case (see definition of contact) in the last 14 days prior to symptom onset … <u>OR</u> [a] patient with severe acute respiratory illness (fever and at least one sign/symptom of respiratory disease, e.g., cough, shortness of breath; <u>AND</u> requiring hospitalization) <u>AND</u> in the absence of an alternative diagnosis that fully explains the clinical presentation. " (Exhibit 2, pg. 11)

**d.      WHO Definition: "Contact" (Covid-19)**

"A contact is a person who experienced any one of the following exposures during the 2 days before and the 14 days after the onset of symptoms of a probable or confirmed case: Face-to-face contact with a probable or confirmed case within 1 meter and for more than 15 minutes; Direct physical contact with a probable or confirmed case; Direct care for a patient with probable or confirmed COVID-19 disease without using proper personal protective equipment … <u>OR</u> [o]ther situations as indicated by local risk assessments. " (Exhibit 2, pg. 12)

**2.      Cases The WHO Would Classify As "Confirmed" Covid-19 Deaths**

---

2       Community transmission has been reported in all 50 states. (Exhibit 18, pg. 1)

A 60 year-old man with a history of sleep apnea, who has a fever and cough and who lives anywhere in the United States (a "suspect case") for whom Covid-19 testing could not be performed because there were no tests available (becomes a "probable case") and who dies in his sleep (becomes a "confirmed case").

A 53 year-old woman, with a fever and runny nose who sleeps in the same bed as her 56 year-old husband who also has a fever and runny nose (a "suspect case) for whom a Covid-19 lab test was inconclusive (becomes a "probable case") who dies of cardiac arrest (becomes a "confirmed case").

A 29 year-old man with a history of severe asthma, who is admitted to the hospital after an asthma attack and is found to have a fever and nasal congestion (a "suspect case") for whom Covid-19 testing could not be performed because there were no tests available (becomes a "probable case") who later dies and where a cause of death could not be clearly identified (becomes a "confirmed case").

**D.    COVID-19: Scientific Data – 0.12-1.6% <u>Overall</u> Mortality Rate**

**1.    Study: British Medical Journal**

A study conducted by researchers from the University of Bern in Switzerland and published on March 3, 2020, found that mortality rates from Covid-19 infection were highly age-specific: (1) In persons aged 0-9 years the mortality rate is 0.0094%; (2) in persons aged 10-19 years the mortality rate is 0.022%; (3)in persons aged 20-29 years the mortality rate is 0.091%; (4) in persons aged 30-39 years the mortality rate is 0.18%; (5) in persons aged 40-49 years the mortality rate is 0.4%; (6) in persons aged 50-59 years the mortality rate is 1.3% (7) in persons aged 60-69 years the mortality rate is <u>4.6%;</u> (8) in persons aged 70-79 years the mortality rate is **<u>9.8%</u>**; (9) in persons aged 80+ years the mortality rate is **<u>18%</u>**.Taking the average mortality rate of infected individuals across all of age groups gives <u>an overall mortality rate of 1.6%</u>. (Exhibit 4)

**2.    Study: University of Southern California (Lab Tests)**

5

Memorandum Of Points And Authorities In Support Of Plaintiff's Emergency Ex Parte Application
For Temporary Restraining Order Without Notice And Motion For Preliminary Injunction
(3:20-cv-08081-GMS)

In a study conducted by the University Of Southern California and the Los Angeles County Department of Public Health, based upon verified laboratory testing it was estimated that   221,000 to 442,000 adults in Los Angeles County have been infected with Covid-19, and with 600 deaths. This estimate is 28 to 55 times higher than the 7,994 confirmed cases (with approximately 600 deaths) reported to the county. (Exhibit 5)

**3.    Study: Stanford University (Lab Tests)**

In a study conducted by researchers from the Stanford University Medical School and submitted for peer-reviewed publication on April 11, 2020, 3,330 persons were tested for evidence of Covid-19 infection. Based upon these tests, the researchers concluded that between 48,000 and 81,000 people in Santa Clara County had been infected. This figure is 50 to 85-times higher than the number of confirmed cases for the county. (Exhibit 6)

**E.    COVID-19: Scientific Data – Mortality Risk Factors**

**1.    Age**

In a study published in the peer-reviewed Journal of the American Medical Association, the researchers reported that persons over 65 years of age were 617% more likely to die of Covid-19 infection than those under age 65. (Exhibit 7)

Data from the Arizona Department Of Health Services "Covid-19 Dashboard" on April 22, 2020, reported a total of 5,459 cases with 229 deaths – a 4.2% mortality rate. 73% of these deaths occurred in persons ages 65-years and up and 89% of all Covid-19 deaths in Arizona occurred in persons ages 55+ years. Persons aged 20-44 years comprised 37% of all Covid-19 cases but just 3% of Covid-19 fatalities. Out of 214 infections in persons ages 0-19, there were no fatalities. (Exhibit 7, 8)

Even based upon the specious WHO and CDC "diagnostic" criteria for Covid-19 infections, these numbers clearly demonstrate that persons under 55-years have very little risk of a fatal outcome due to Covid-19 infection.

**2.    Hypertension**

In a pooled study conducted by a international team of researchers from both the United States and Italy, published March 31, 2020 in the peer-reviewed Polish Archives of Internal medicine, the researchers reported that the risk of mortality from Covid-19 infection is nearly 242% higher in persons with hypertension than those without. (Exhibit 9)

**3.    Other Serious Chronic Health Conditions**

In a study published March 6, 2020, in the New England Journal of Medicine, persons infected with Covid-19 who had: chronic obstructive pulmonary disease (COPD) were 5.8-times more likely;  diabetes 2.8-times more likely, hypertension 1.8-times more likely, heart disease 3.2-times more likely, and kidney disease 3.4-times more likely, to experience a severe infection vs. those without these conditions. <u>Astonishingly, these patients with serious chronic health were **81-times more likely to die** than infected patients without these conditions.</u> (Exhibit 10)

**III.    <u>FACTUAL BACKGROUND</u>**

**A.    Governor Ducey's Declaration Of Emergency And Executive Orders**

On March 11, 2020, Governor Ducey issued a Declaration Of Emergency, "COVID-19." (Exhibit 11)

On March 19, 2020, Governor Ducey issued Executive Order #2020-07, "Proactive Measures To Protect Against COVID-19." (Exhibit 12)

On March 19, 2020, Governor Ducey issued Executive Order #2020-09, "Limiting The Operations Of Certain Businesses To Slow The Spread Of COVID-19." (Exhibit 13)

On March 30, 2020, Governor Ducey issued Executive Order #2020-18, "Stay Home, Stay Healthy, Stay Connected." (Exhibit 14)

## V.      ARGUMENT

**A.      Executive Order #2020-18 Is An Unlawful And Unconstitutional *Per Se* Mass Quarantine. It Violates The Fifth And Fourteenth Amendments To The United States Constitution.**

Quarantine is "the separation and restriction of movement of persons who, while not yet ill, have been exposed to an infectious agent and therefore may become infectious."[3] In contrast to isolation which separates sick people with a contagious disease from people who are not sick,[4] quarantine confines those who are asymptomatic and healthy.[5] Under Arizona law, the word "quarantine" as applied to persons – as opposed to livestock or plants – is defined under a single statute as "the restriction of activities of persons who have been exposed to an afflicted person."[6]

The U.S. Supreme Court has repeatedly upheld the rights of state public health authorities to impose quarantines for the protection of the public.[7] Clearly, a symptomatic person who is infected with a serious disease that will spread from person to person rightly prompts the severe governmental action of isolation. In those cases

---

[3]      See Rosen, George. A History of Public Health. Baltimore: Johns Hopkins University Press, 1993
[4]      Quarantine and Isolation, U.S. Centers for Disease Control, https://www.cdc.gov/quarantine/index.html, Accessed April 26, 2020
[5]      See Kathleen S. Swendiman & Jennifer K. Elsea, Cong. Res. Serv., Federal and State Quarantine and Isolation Authority (2007), https://biotech.law.lsu.edu/cases/pp/RL33201.pdf, Accessed April 26, 2020
[6]      See A.R.S. § 36-711(19)
[7]      See *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 25, 25 S.Ct. 358, 49 L.Ed. 643 (1905) (recognizing the "authority of a state to enact quarantine laws and health laws of every description") (internal quotations and citations omitted); see also *Compagnie Francaise de Navigation a Vapeur v. La. State Bd. o f Health*, 186 U.S. 380, 387, 22 S.Ct. 811, 46 L.Ed. 1209 (1902) ("[T]he power of States to enact and enforce quarantine laws for the safety and the protection of the health of their inhabitants ... is beyond question."); *Ogden v. Gibbons*, 22 U.S. (9 Wheat.) 1,203, 6 L.Ed. 23 (1824) (a state has the power "to provide for the health of its citizens" by quarantine laws)

individual liberty interests necessarily give way to protect the public in an emergency.[8] Nevertheless, Due Process requirements are not abridged by the imposition of a quarantine.[9]

### 1.    Quarantine And Due Process Rights

The Fifth and Fourteenth Amendments prohibit governments at all levels from depriving individuals of any constitutionally protected liberty interest without due process of law. Federal and state quarantine laws are therefore subject to constitutional due process constraints. Procedural due process requires that a deprivation of liberty be "accompanied by minimum procedural safeguards, including some form of notice and a hearing."[10]

The U.S. Supreme Court declared being free from physical detention by one's own government is "the most elemental of liberty interests."[11] It is well settled that freedom from physical restraint is a "liberty interest" protected by the due process clause of the Fourteenth Amendment.[12] Due process generally requires notice and a hearing in advance of a deprivation of liberty.[13] This is most salient in the context of quarantining asymptomatic individuals given that asymptomatic individuals are most at risk for unnecessary loss of their liberty and procedural due process violations.[14]

---

8    See Michelle A. Daubert, Comment, Pandemic Fears and Contemporary Quarantine: Protecting Liberty Through a Continuum of Due Process Rights, 54 Buff. L. Rev. 1299, 1318 (2007)
9    See *Mugler v.  Kansas* 123 U.S. 623, 661 (1887)("It does not at all follow that every statute enacted ostensibly for the promotion of [public health, morals or safety] is to be accepted as a legitimate exertion of the police powers of the state.")
10    *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 624, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974)
11    See *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004)
12    See *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997)
13    *Zinermon v. Burch*, 494 U.S. 113, 127, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990)
14    *Carey v. Piphus*, 435 U.S. 247, 259 (1978)("Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property.")(citing: *Mathews v. Eldridge*, 424 U.S. 319, 344 (1976))

Quarantine is not a mere inconvenience. Like a prisoner, a quarantined individual is not free to engage in daily activities or to leave a place, perhaps except under a narrow set of circumstances. The effect of quarantine therefore is that it essentially detains and commits an individual to the custody of the government although no crime has been committed.[15] The government may not intend for a quarantine to be punitive, but it nevertheless is so, and quarantined individuals exhibit a high prevalence of psychological distress.[16] Even short durations of quarantine can cause post-traumatic stress disorder (PTSD) and depression.[17] Studies show 28.9% of quarantined individuals experience symptoms of post-traumatic stress disorder (PTSD) and 31.2% exhibit signs of depression.[18]

In quarantine, the tension between individual liberties and public necessity is balanced by requiring health measures to be reasonable and not arbitrary and is tested there must be demonstrated:  (1) a public health necessity, (2) an effective intervention with a demonstrable connection between means and ends, (3) proportionality (i.e., that the intervention is neither too broadly nor too narrowly tailored), and (4) that the quarantine or isolation is in the least restrictive setting while accomplishing its purpose.[19]

## 2.    Requirements Under Arizona Law For Quarantine

[15]    See *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (considering standard of proof required by the Fourteenth Amendment in a civil proceeding brought under state law to commit an individual involuntarily for an indefinite period to a state mental hospital, "civil commitment <u>for any purpose</u> constitutes a significant deprivation of liberty that requires due process protection.") (emphasis added)

[16]    See, e.g., Laura Hawryluck et al., SARS Control and Psychological Effects of Quarantine, Toronto, Canada, 10 Canadian J. Psychiatry 1206, 1209–11 (2004)

[17]    Emma Robertson et al., The Psychosocial Effects of Being Quarantined Following Exposure to SARS: A Qualitative Study of Toronto Health Care Workers, 49 Canadian J. Psychiatry 403, 404–06 (2004)

[18]    *Id.* at 1206. ("Longer durations of quarantine have been associated with an increased prevalence of PTSD symptoms.")

[19]    Daubert, MA. Pandemic fears and contemporary quarantine: protecting liberty through a continuum of due process rights. Buff L Rev. 2007;54:1299–353; See also *Shelton v. Tucker*, 364 U.S. 479, 488 (1960) ("[E]ven though the  governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.")

Under Arizona law the governor may order a quarantine "during a state of emergency … in which there is an occurrence or the imminent threat of smallpox, plague, viral hemorrhagic fevers or a <u>highly contagious and highly fatal disease</u> with transmission characteristics similar to smallpox" upon consultation with the director of the department of health services.[20]

During a state of emergency where the disease does not meet this "smallpox standard" a quarantine may only be issued by the Arizona Department of Health Services and only through one of two ways: (1) court order; or (2) written directive "if any delay in the isolation or quarantine of the person would pose an immediate and serious threat to the public health."[21]

### a.      Quarantine By Court Order

The Department of Health Services may obtain a quarantine order from a court by filing a petition which specifies the following: (1) the identity of the person or persons subject to quarantine; (2) the premises subject to quarantine; (3) the date and time at which quarantine commences; (4) the suspected contagious disease, if known; (5) a statement of compliance with the conditions and principles for quarantine; and (6) a statement of the basis on which quarantine is justified. The petition must be accompanied by the sworn affidavit of the department attesting to the facts asserted in the petition  together with any further information that may be relevant and material to the court's consideration.[22] Notice to the person or group of persons identified in the petition must be completed within twenty-four hours after filing the petition and in accordance with the rules of civil procedure[23] and a hearing must be held on this petition

---

20      See A.R.S. § 36-787(C)(2)
21      See generally A.R.S. §§ 36-788, 36-789
22      See A.R.S. §§ 36-789(B), 36-789(C)
23      See A.R.S. §§ 36-789(D)

within five days after filing of the petition except under "extraordinary circumstances and for good cause shown."[24]

A court order authorizing quarantine may do so only for a period not to exceed thirty days and the order must: (1) identify the isolated or quarantined person or group of persons by name or shared or similar characteristics or circumstances; (2) specify factual findings warranting isolation or quarantine including any conditions necessary to ensure that isolation or quarantine is carried out within the stated purposes and restrictions; (3) be served on the affected person or persons in accordance with the rules of civil procedure.[25]

A person or persons quarantined pursuant to A.R.S. § 36-789 may apply to the court for an order to show cause why the person or persons should not be released.  The court must rule on the application to show cause within forty-eight hours after it is filed and if the court grants the application it must schedule a hearing within twenty-four hours after the order to show cause is issued.[26]  A person so quarantined may request a court hearing regarding the person's treatment and the conditions of the quarantine."[27]

### b.    Summary Quarantine

A quarantine order summarily issued by the Department of Health Services requires that within ten (10) days after issuing the written directive the department "shall file a petition for a court order authorizing the initial or continued isolation or quarantine of a person or group of persons."[28] The summary issuance of a quarantine order by the Department of Health Services does not in any manner waive the due process requirements set forth under A.R.S. § 36-789.

Executive Order 2020-18

---

24      See A.R.S. § 36-789(E)
25      See A.R.S. § 36-789(B)
26      See A.R.S. § 36-789(I)
27      See A.R.S. § 36-789(J)
28      See A.R.S. § 36-789(A)

3.      **Executive Order #2020-18 Is A *Per Se* Summary Quarantine**

Executive Order 2020-18 attempts to create an entirely new term of art – the "stay at home order" – while infringing upon fundamental rights in the exact same manner as a quarantine. The injury from a punch is not attenuated by referring to it instead as a "fist kiss", the use of doublespeak to characterize Executive Order #2020-18 as something other than a quarantine does not change objective reality and nor does it magically create from thin air a constitutional exception to Due Process requirements. Yet this appears to be exactly what this Order seeks to do, and in fact does.

Executive Order 2020-18 was directly and expressly predicated upon Governor Ducey's declaration of a Public Health State of Emergency. It explicitly prohibits all persons who reside in the state of Arizona from leaving their homes except under a very narrow set of exceptions. Under any objectively reasonable definition of quarantine including under Arizona law[29] Executive Order #2020-18 is a quarantine. That is *exactly* what it is. Governor Ducey's own words offered on live television conclusively support this claim.[30]

4.      **Executive Order #2020-18 Infringes Upon The Fifth Amendment Because It Restricts Freedom Of Movement Without Procedural Due Process**

The fundamental right to travel at home and abroad is an important aspect of liberty guaranteed in the Due Process Clause of the Fifth Amendment.[31] "Freedom of

---

29      See A.R.S. § 36-711(19)(quarantine defined as "the restriction of activities of persons who have been exposed to an afflicted person.")(emphasis added); Presupposing that Covid-19 infection is widespread, which is implicit in the words "based on an epidemiological assessment" stated on page two of the Executive Order.

30      Covid-19 Town Hall Meeting, 12 News, https://www.youtube.com/watch?v=dmOMXQjqKco, Accessed April 25, 2020 (quoting Governor Ducey: "In terms of quarantining, anyone who is sick should be staying home, anyone who has symptoms should be staying home, and anyone that violates those types of directions, there's escalating authority that the governor has. We can work with law enforcement so that they won't be … it's in place whenever we put it in place. Whenever we have someone violating it.")

31      See *Dunn v. Blumstein*, 405 U.S. 330, 342 (1972)(affirming the existence of a "fundamental personal right, the right to travel."); *United States v. Guest*, 383 U.S. 745, 758 (1966) ("[t]he constitutional right to travel from one State to another … occupies a

13

Memorandum Of Points And Authorities In Support Of Plaintiff's Emergency Ex Parte Application
For Temporary Restraining Order Without Notice And Motion For Preliminary Injunction
(3:20-cv-08081-GMS)

movement is akin to the right of assembly and to the right of association."[32] This right exists whether that travel be international,[33] interstate,[34] or intrastate,[35] and <u>any infringement must pass strict scrutiny</u>.[36]  "The right to travel, to go from place to place as the means of transportation permit, is a natural right subject to the rights of others and to reasonable regulation under law. A restraint imposed by the Government of the United States upon this liberty, therefore, must conform with the provision of the Fifth Amendment that 'No person shall be **deprived of liberty** without due process of law.'"[37]

5.      **Executive Order #2020-18 Violates The Substantive Due Process Requirements Of The Fourteenth Amendment**

The language of the Fourteenth Amendment requires the provision of substantive due process when an interest in one's "life, liberty or property" is threatened.[38] Substantive due process "serves to prevent governmental power from being 'used for purposes of oppression.'"[39] The "touchstone of due process is protection of the individual

_____

position fundamental to the concept of our Federal Union. It is a right that has been firmly established and repeatedly recognized."); *Miller v. Reed*, 176 F.3d 1202 (9th Cir.1999)(recognizing "the fundamental right to interstate travel")(citing *Monarch Travel Servs., Inc. v. Associated Cultural Clubs, Inc.*, 466 F.2d 552, 554 (9th Cir.1972))

32      *Aptheker v. Sec. of State*, 378 U.S. 500, 520 (1964)

33      See *Kent v. Dulles*, 357 U.S. 116, 125–26 (1958) ("The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment. . . . Freedom of movement across frontiers in either direction, and inside frontiers as well . . . is basic in our scheme of values.")

34      *Paul v. Virginia*, 75 U.S. 168 (1869)(affirming the "right of free ingress into other States, and egress from them."); See also *Crandall v. State of Nevada*, 73 U.S. 35 (1867) (upholding fundamental right to interstate travel, "We are all citizens of the United States, and as members of the same community must have the right to pass and repass through every part of it without interruption")

35      See *Johnson v. City of Cincinnati*, 310 F.3d 484, 498 (6th Cir. 2002)("[I]ntrastate travel … is an everyday right, a right we depend on to carry out our daily life activities. It is, at its core, a right of function.")

36      See *Shapiro v. Thompson*, 394 U.S. 618, 638 (1969)(the right to interstate travel is a fundamental right that triggers strict scrutiny review)

37      *Shachtman v. Dulles*, 225 F.2d 938 (D.C. Cir. 1955) (emphasis in original)

38      *Morrissey v. Brewer*, 408 U.S. 471, 481 (1982)("When protected interests are implicated, the right to some kind of prior hearing is paramount. But the range of interests protected by procedural due process is not infinite.")(citing *Board of Regents v. Roth*, 408 U.S. 564, 569–71 (1972))

39      *Daniels v. Williams*, 474 U.S. 327, 331 (1986)(quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 277 (1856))

14

Memorandum Of Points And Authorities In Support Of Plaintiff's Emergency Ex Parte Application
For Temporary Restraining Order Without Notice And Motion For Preliminary Injunction
(3:20-cv-08081-GMS)

against arbitrary action of government."[40] Substantive due process can be used to challenge abuses of executive power.[41]

In the Ninth Circuit, plaintiffs can establish a substantive Due Process violation either by proving violation of a specific liberty or property interest, or by showing that the state's conduct "shocks the conscience."[42] Executive Order #2020-18 satisfies both requirements.

### a.    Executive Order #2020-18 Violates A Specific Liberty Interest

Executive Order #2020-18 sets forth <u>the specific criteria under which Arizonans are "permitted" to leave their homes</u>:

> "All persons may leave their place of residence <u>only</u> for Essential Activities, to participate in or receive Essential Governmental Functions, or to participate in or fulfill Essential Functions outlined in Executive Order #2020-12."
>
> …
>
> "Essential Activities include:
>
> a.    Obtaining necessary supplies and services for family, household members and pets, such as groceries, food and supplies for household consumption and use, supplies and equipment needed to work from home, assignments for completion of distance learning and products necessary to maintain safety, sanitation and essential   maintenance of the home and residence.
>
> b.    Engaging in activities essential for the health and safety of family, household members and pets, including things such as seeking medical, behavioral health or emergency services and obtaining medical supplies or medication.
>
> c.    Caring for a family member, friend, or pet in another household or residence, which includes but is not limited to transportation of a family member, friend or their pet for

---

40    *County of Sacramento v. Lewis* , 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)
41    *Id.* ("Since the time of our early explanations of due process, we have understood the core of the concept to be protection against arbitrary action … ")
42    See *Martinez v. City of Oxnard*, 337 F.3d 1091, 1092 (9th Cir. 2003) ("The Fourteenth Amendment's Due Process Clause protects individuals from state action that either 'shocks the conscience' or interferes with rights 'implicit in the concept of ordered liberty.'")(citation omitted) (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952))

essential health and safety activities and to obtain necessary supplies and services for the other household.

d. Engaging in outdoor exercise activities, such as walking, hiking, running, biking or golfing, but only if appropriate physical distancing practices are used.

e. Attending or conducting work or volunteering in Essential Functions which includes but is not limited to transporting children to child care services for attending work in an essential service.

f. Constitutionally protected activities such as speech and religion and any legal or court process provided that such is conducted in a manner that provides appropriate physical distancing to the extent feasible.

Notwithstanding that "constitutionally protected activities such as speech and religion" are specifically "provided for" in this Order, this provision is oxymoronic to the Order itself. The Order specifically prohibits the constitutionally-protected right to free movement and travel. To accept therefore that constitutionally-protected activities are indeed exempted from this Executive Order necessarily requires one to disregard the Order entirely, since the entirety of the Order is a manifest infringement upon a fundamental liberty guaranteed under the Constitution of the United States. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects."[43]

This very obvious failure of basic logic in the Order and which presents a clear paradox, would probably be quite humorous were it not for the fact that Executive Order #2020-18 very clearly violates the substantive due process requirement of the Fourteenth Amendment and being unlawfully restrained in the exercise of basic rights by heavy-handed government acts is **not at all funny.**

A fundamental right, such as the right to be free from arbitrary and unjustified mass detention, is inalienable – it is "implicit in the concept of ordered liberty."[44]  The U.S Supreme Court states very plainly: (1) "The state cannot diminish rights of the

---

[43]     *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001)(emphasis added)
[44]     *Palko v. Connecticut*, 302 U.S. 319, 324-25 (1937)

people.";[45] and (2) "Statutes that violate the plain and obvious principles of common right and common reason are null and void."[46]

### b.   Executive Order #2020-18 Shocks The Conscience

Executive Order #2020-18 acts with deliberate indifference to individual rights. It criminalizes ordinary behavior to include the exercise of basic constitutionally-protected freedoms, such as the freedom to leave one's home and wander about without any specific purpose.[47] Under Executive Order #2020-18, this is a crime.[48]

Where government officials have time to deliberate yet act with deliberate indifference to individual rights,[49] they have engaged in conscience-shocking behavior that triggers liability.[50]"Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action."[51]

Arizona law has set forth a clearly-established procedure for imposing quarantine[52] with clearly-established standards to ensure that due process rights are protected.[53] Governor Ducey instead chose to ignore this law and these standards and to disregard the fundamental constitutional rights of all Arizonans.

Even if it could be reasonably argued that Executive Order #2020-18 serves a legitimate government purpose, it is not the "least restrictive means" it's simply the most

---

45   *Hertado v. California*, 110 U.S. 516 (1884)
46   *Bennett v. Boggs*, 1 Baldw. 60 (1830)
47   *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972)
48   Ariz. Exec. Order No. 2020-18 (March 30, 2020); Covid-19 Town Hall Meeting, 12 News, https://www.youtube.com/watch?v=dmOMXQjqKco, Accessed April 25, 2020 (quoting Governor Ducey: '[I]f someone is not listening to the order law enforcement can suggest that they begin listening to the order and if they don't they're going to have a class 1 misdemeanor which is a $2500 fine and and up to six months in jail, and we will enforce that.")
49   See *Lewis*, 523 U.S. 833
50   *Hicks v. Churchich*, 161 F.3d 1030, 1040–42 (7th Cir. 1998) (noting that, although *Lewis* rejected negligence as a standard, deliberate indifference should be employed whenever actual deliberation is practical)
51   *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)
52   See §§ A.R.S. § 36-787(C)(2), 36-788
53   See A.R.S. § 36-789 (titled: "Due process for isolation and quarantine during a state of emergency or state of war emergency")

17

Memorandum Of Points And Authorities In Support Of Plaintiff's Emergency Ex Parte Application
For Temporary Restraining Order Without Notice And Motion For Preliminary Injunction
(3:20-cv-08081-GMS)

1    expedient.[54]  This is conscience-shocking.

2    **B.**      **Governor Ducey's Declaration Of Emergency Is Unsupported By  Law**

3           Arizona law grants the governor the sole authority and discretion to declare a

4    state of emergency:

5           "The governor may proclaim a state of emergency which shall take effect
6           immediately in an area affected or likely to be affected if the governor
            finds that circumstances described in [A.R.S. §26-301(15)] exist." [55]

7           'State of emergency' means the duly proclaimed existence of conditions of
8           disaster or of <u>extreme peril to the safety of persons</u> or property within the
            state caused by air pollution, fire, flood or floodwater, storm, <u>epidemic</u>,
9           riot, earthquake or other causes, except those resulting in a state of war
            emergency which are or are likely to be beyond the control of the services,
10          personnel, equipment and facilities of any single county, city or town, and
            which require the combined efforts of the state and the political
11          subdivision."[56]

12          "During a state of emergency … The governor shall have complete
            authority over all agencies of the state government and the right to
13          exercise, within the area designated, all police power vested in the state by
            the constitution and laws of this state in order to effectuate the purposes of
14          this chapter … The governor may direct all agencies of the state
            government to utilize and employ state personnel, equipment and
15          facilities for the performance of any and all activities designed to prevent
            or alleviate actual and threatened damage due to the emergency. The
16          governor may direct such   agencies to provide supplemental services and
            equipment to political subdivisions to restore any services in order to
17          provide for the health and safety of the citizens of the affected area." [57]

18   **1.**      **The (Ordinary) Meaning Of "Extreme Peril"**

19          "Extreme peril" as set forth under A.R.S. § 26-301(15) is defined neither by

20   Arizona statute nor Arizona court opinion. It is not defined under any federal statute nor

21   federal court opinion. "Extreme peril" is not a term of art. It has no accepted meaning in

22

23   _____

24   54    The "least restrictive means" test comes from the Supreme Court's decision in
     *Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960)(holding that even a
25   legitimate government "purpose cannot be pursued by means that broadly stifle
     fundamental personal liberties when the end can be more narrowly achieved.")
     55    A.R.S. §26-303(D)
26   56    A.R.S. §26-301(15) (emphasis added)
     57    A.R.S. §26-303(E)

27

28

18

Memorandum Of Points And Authorities In Support Of Plaintiff's Emergency Ex Parte Application
For Temporary Restraining Order Without Notice And Motion For Preliminary Injunction
(3:20-cv-08081-GMS)

the area of law addressed by the statute[58] nor any common law meaning.[59] It has not been borrowed or adopted from another statute.[60]   Its definition is therefore its ordinary meaning.[61]

"Extreme" means "existing in a very high degree"[62] and the legal definition of "peril"[63] is "exposure to the risk of death, destruction, or loss."[64] For the purposes of A.R.S. §§ 26-303(D) and 26-301(15), the ordinary meaning of "extreme peril" is therefore "a very high degree of exposure to the risk of death."

**2.      The COVID-19 Pandemic Does Not In Any Manner Represent "A Very  High  Degree Of Exposure To The Risk Of Death"**

As set forth previously herein, the most credible scientific evidence presently available in fact suggests that the fear and panic gripping the world is wholly unjustified. Certainly an infectious disease, where the overwhelming majority of those who are infected  – by some estimates more than 99.88% in one-hundred[65] – will recover without any medical intervention, cannot reasonably be characterized as a condition of "extreme peril."

Covid-19 does not kill randomly and indiscriminately. Its has well-established risk factors – the elderly with chronic serious health conditions. Certainly no amount of

---

58      See *Sullivan v. Stroop*, 496 U.S. 478, 483 (1990) (five-Justice majority holding that "child support" in the AFDC statute is restricted to that term's specialized use in the Child Support program under the Social Security Act)
59      See *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 739-40 (1989) (relying on traditional common law agency principles for meaning of term "employee").
60      See *Carolene Products Co. v. United States*, 323 U.S. 18, 26 (1944)("adoption of the wording of a statute from another legislative jurisdiction carries with it the previous judicial interpretations of the wording.")
61      See *FDIC v. Meyer*, 510 U.S. 471, 476 (1994)(in the absence of a statutory definition "we construe a statutory term in accordance with its ordinary or natural meaning.")
62      "Extreme" Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/extreme, Accessed March 20, 2020.
63      "Peril", Merriam-Webster's Dictionary of Law (1996)
64      "Destruction" and "loss" clearly refer to property.
65      British Medical Journal, COVID-19 Antibody Seroprevalence in Santa Clara County, California, https://www.medrxiv.org/content/10.1101/2020.04.14.20062463v1, Posted April 17, 2020, Accessed April 26, 2020

19

Memorandum Of Points And Authorities In Support Of Plaintiff's Emergency Ex Parte Application
For Temporary Restraining Order Without Notice And Motion For Preliminary Injunction
(3:20-cv-08081-GMS)

hysterical fear-mongering will change the basic fact of objective reality that under not even the most liberal definition of "extreme peril" could COVID-19 even remotely be characterized in such a way.

**C.      The Court Should Grant Preliminary Injunctive Relief**

The purpose of a preliminary injunction is to preserve the status quo and the rights of the parties until a final judgment on the merits.[66]

A preliminary injunction should issue where a plaintiff establishes: (1) a high likelihood of suffering irreparable harm in the absence of preliminary relief; (2) a high likelihood of success on the merits; (3) that the balance of equities tips favorably towards plaintiff(s); and (4) an injunction is in the public interest.[67]

Alternatively, a court may grant the injunction if the plaintiff demonstrates either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor.[68]

**1.      Plaintiff Will Suffer Irreparable Injury Should Enforcement Of Executive Orders #2020-18  Not Be Enjoined.**

Irreparable injury is "harm not remediable by damages."[69] Federal circuit courts have repeatedly stated that irreparable injury may be presumed in cases involving an alleged violation of a constitutional right.[70]

**a.      The Unlawful Infringement Upon A Constitutional Right Is An Irreparable Harm Sufficiently Giving Rise To Injunctive Relief.**

---

66      See *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010).
67      See *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012)
68      See *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).
69      See *Sec. Pest & Termite Sys. of S. Ariz., Inc. v. Reyelts*, No. 1 CA-CV 14-0237 (Ariz. Ct. App. May. 14, 2015)(citing *Shoen v. Shoen*, 167 Ariz. 58, 63 (App. 1990)); see also *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632–34 (7th Cir.2005) (reversing district court order denying injunction to enforce restrictive covenant); *Wildman v. Berwick Universal Pictures*, 983 F.2d 21, 24 (5th Cir. 1992).
70      See, e.g., *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1235 (10th Cir. 2005) ("We therefore assume that plaintiffs have suffered irreparable injury when a government deprives plaintiffs of their commercial speech rights.");  see also *Brown v. Cal. Dep't of Trans.*, 321 F.3d 1217, 1225 (9th Cir. 2003)

When a government rule, policy, or conduct is alleged to infringe upon a constitutionally protected expressive right, the plaintiff can demonstrate the requisite irreparable injury by showing that he and others are precluded from exercising that right.

Executive Order #2020-18 subjects persons to arrest for exercising their constitutionally-protected right to free movement. This is an irreparable injury.[71]

Plaintiff has satisfactorily demonstrated an exigency that warrants immediate intervention by the Court. A temporary restraining order and preliminary injunctive relief against Defendants is the now the only reasonable course of action.

**2.    Plaintiff Has Established A High Likelihood Of Success On The Merits Of His Claims Against Defendants.**

Plaintiff has made a sufficiently-clear showing that Executive Order #2020-18 constitutes a violation of Plaintiff's constitutional rights and has demonstrated a high probability that this Order is in fact unconstitutional.

**3.    The Balance Of Equities Tips Favorably Towards Preliminary Injunctive Relief.**

Should Governor Ducey be enjoined and restrained, there is no possibility for potential harms to be suffered by him. There is no inherent constitutional right to government protection and Governor Ducey is immune from any liability for his failure to act under well-settled precedent, even if such failure was negligent.[72]

---

71    See *Steffel v. Thompson*, 415 U.S. 452, 463 n.12 (1974) ("[A] showing of irreparable injury might be made in a case where . . . an individual demonstrates that he will be required to forgo constitutionally protected activity in order to avoid arrest."); *United States v. Bogle*, 855 F.2d 707, 710–711 (11th Cir. 1988) (holding that the "unnecessary deprivation of liberty clearly constitutes irreparable harm"); *Cobb v. Green*, 574 F.Supp. 256, 262 (W.D. Mich. 1983) ("There is no adequate remedy at law for a deprivation of one's physical liberty. Thus the Court finds the harm asserted by Plaintiff is substantial and irreparable.").
72    See *DeShaney v. Winnebago County Dep't of Social Servs.*, 109 S. Ct. 998, 1007 (1989) (finding no duty to protect individuals not in custody of the state); *Daniels v. Williams*, 474 U.S. 327 (1986)(construing mere negligence as insufficient to establish violation of due process).

Should the Court not grant the relief as request by Plaintiff however, immediate and irreparable harm will befall him in that the infringement upon his Fifth and Fourteenth Amendment rights will continue.

This showing alone is sufficient for the Court to grant a preliminary relief based upon established U.S. Supreme Court precedent.[73]

**4.     Preliminary Relief Is In The Public Interest – It Will Serve The Public Interest And Will Not Harm Defendant.**

As numerous courts have emphasized, "It is always in the public interest to prevent the violation of a party's constitutional rights."[74]  Overwhelming federal precedent treats the amelioration of constitutional violations to be in the public interest.[75]

There is no legitimate argument for why an exception to established precedent should be created this matter.

## VI.     <u>CONCLUSION</u>

Constitutional rights are not subject to summary disregard by government officials, even during pandemics.  Because of the actions of Governor Ducey, Plaintiff and indeed all Arizonans have now been placed at risk of suffering immediate, irreparable harm. For the foregoing reasons as set for in this Memorandum, the Court should grant the preliminary relief as requested here .

---

73     See Elrod v. Burns :: 427 U.S. 347 (1976)
74     *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (quoting and citing cases).
75     See *Giovani Carandola v. Bason*, 303 F.3d 507, 521(4th Cir. 2002) ("[W]e agree with the district court that upholding constitutional rights surely serves the public interest."); G & V Lounge v. Michigan Liquor Control Comm., 23 F.3d 1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."); *Freedberg v. United States Dept. of Justice*, 703 F. Supp. 107, 111 (D.D.C. 1988) ("[I]t is in the public interest to uphold a constitutionally guaranteed right." (quotations and citation omitted); see also, e.g., *Wiley Mission v. New Jersey, Dep't of Cmty. Affairs*, 2011 U.S. Dist. LEXIS 96473, at * 59 (D.N.J. Aug. 25, 2011) (granting permanent injunction against state agency in part because "requiring the Department to abide by the Constitution serves the public interest"); *Glatts v. Superintendent Lockett*, 2011 U.S. Dist. LEXIS 1910, at *18-19 (W.D. Pa. 2011) ("[H]aving a State's employees follow the Federal Constitution is also in the public interest.").

Dated:  April 27, 2020

Respectfully Submitted,

By:      */s/ Joseph M. McGhee*
         Plaintiff, *in Pro Per*

Memorandum Of Points And Authorities In Support Of Plaintiff's Emergency Ex Parte Application
For Temporary Restraining Order Without Notice And Motion For Preliminary Injunction
(3:20-cv-08081-GMS)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **VERIFICATION**

I, Joseph Martin McGhee, do solemnly swear and declare under penalty of perjury that the statements and allegations of fact contained in this Third Amended Complaint and the Memorandum of Points and Authorities filed in support thereof, are true and correct to the best of my knowledge, and that this verification was executed this 27th day of April, 2020, at Coconino County Arizona.

/s/ Joseph M. McGhee

Memorandum Of Points And Authorities In Support Of Plaintiff's Emergency Ex Parte Application
For Temporary Restraining Order Without Notice And Motion For Preliminary Injunction
(3:20-cv-08081-GMS)