Joseph Martin McGhee
P.O. Box 91
Flagstaff, AZ 86002
Tel: (928) 600-0954
mcghee.v.city.of.flagstaff.et.al@gmail.com

Plaintiff, *in Pro Per*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Joseph Martin McGhee,<br><br>  Plaintiff,<br><br>  vs.<br><br>The City of Flagstaff; Coral Evans, Sued in her Official Capacity as Mayor of the City of Flagstaff; Doug Ducey, Sued in his Official Capacity as Governor of the State of Arizona,<br><br>  Defendants. | No. 3:20-cv-08081-GMS<br><br>**PLAINTIFF'S MOTION FOR JUDICIAL NOTICE WITH SUPPORTING MEMORANDUM**<br><br>Assigned to the Hon. G. Murray Snow |

Plaintiff Joseph Martin McGhee, pursuant to Fed. R. Evid. 201, respectfully moves the Court to take judicial notice of certain adjudicative facts from: learned treatises; public documents; and publicly available documents, as set forth below.

Plaintiff incorporates by reference from his Third Amended Complaint and the exhibits attached thereto and explicitly incorporates these exhibits, ("Comp. Ex."), into this Motion, in addition to the new exhibits as set forth herein. Plaintiff additionally incorporates by reference as substantive, all footnotes contained herein.

## I.  INTRODUCTION

Federal Rules of Evidence set forth two avenues for a court to take judicial notice: "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2)

can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Federal Rules of Evidence specifically recognize the court may take judicial notice of reliability. Fed. R. Evid. 801(18). Such a finding is typically reserved for standard reference works or cases where the judge has other indicia of reliability. See *Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011)(specifically relying on and referring to statements from publications by medical authorities in reversing dismissal of § 1983 claim); see also *Milward v. Acuity Specialty Products Group, Inc.*, 969 F. Supp. 101, 113 (D. Mass 2013).

Official government publications require no extrinsic evidence of authenticity in order to be admitted. See generally Fed.R.Evid. 902 et. seq ("[O]fficial [p]ublications … issued by a public authority" are self-authenticating). Federal, state and municipal websites, including those of governmental agencies, are likewise self-authenticating publications. See, e.g., *Williams v. Long*, 585 F. Supp. 2d 679, 688 n. 4 (D. Md. 2008) (holding that Rule 902(5) self-authenticating "other publications" includes information posted on the Internet by a qualifying public authority). Federal courts are permitted to take judicial notice of information contained on state and federal government websites whose accuracy cannot reasonably be questioned. See *United States v. Garcia*, 855 F.3d 615, 621-22 (4th Cir. 2017) (taking notice of excerpts from United States Citizenship and Immigration Services website, including the USCIS Policy Manual explaining the naturalization process)("This court and numerous others routinely take judicial notice of information contained on state and federal government websites."); see also *Ohio Valley Envtl. Coal., Inc. v. Fola Coal Co.*, No. 2:12-3750, 2013 WL 6709957 (S.D. W. Va. Dec. 19, 2013) (taking judicial notice of information found on the website of the West Virginia Secretary of State); *Newton v. Holland*, 2014 WL 318567 (E.D. Ky. Jan. 29, 2014).

**A.    Exceptions To The Rule Against Hearsay**

    **1.    Rule 803**

Federal Rules of Evidence provide a hearsay exception for statements in learned treatises if: "the statement is called to the attention of an expert witness on cross-examination or relied on by the expert on direct examination; and [the] publication is established as a reliable authority by the expert's admission or testimony, by another expert's testimony, or by judicial notice." Fed. R. Evid. 803(18)

This exception is to allow "the treatise speak" without cross-examination and through another party because "a high standard of accuracy is engendered by various factors: the treatise is written primarily and impartially for professionals, subject to scrutiny and exposure for inaccuracy, with the reputation of the writer at stake."[1] Further, Rule 803(18) actually admits the treatise into evidence and the Court should therefore decide whether the treatise has been "established as a reliable authority." See *Meschino v. North American Drager*, Inc.841 F.2d 429 (1st Cir. 1988)("The price for escape from cross-examination for a treatise is a higher standard than the 'qualified' standard set for live witnesses. A treatise can be admitted as a 'reliable authority' by establishing the recognition of the authoritative stature of the writer or the affirmative acceptance of the article itself in the profession.")[2]

    **2.    Rule 807**

Federal Rules of Evidence additionally provide for a "residual exception" to the rule of hearsay. See generally Fed.R.Evid. 807. Under this rule "a hearsay statement is not excluded by the rule against hearsay" if: (1) "the statement is supported by sufficient guarantees of trustworthiness"; and (2) if "it is more probative on the point for which it

---

1    See Fed. R. Evid. 803 advisory committee's note (citing John H. Wigmore, Wigmore on Evidence § 1692 (1980))
2    See also *United States v. Jones* 712 F.2d 115 (5th Cir. 1983)(establishing a formula for reliability for works which "have been subjected to widespread collegial scrutiny."); *Burgess v. Premier Corp.* 727 F.2d 826 (9th Cir. 1984)

is offered than any other evidence that the proponent can obtain through reasonable efforts"; if (3) "the proponent gives an adverse party reasonable notice of the intent to offer the statement … in writing before the trial or hearing."[3]

Rule 807 applies to hearsay "not specifically covered" by a Rule 803 or 804 exception and makes the rule applicable to hearsay "not admissible under" those exceptions.[4] "[T]he court should proceed directly to a determination of whether the hearsay is supported by guarantees of trustworthiness."[5]

**B.     Peer Reviewed Medical And Scientific Journals**

In many medical and scientific journals, an article cannot be published without "peer review." Peer review is the process of subjecting an author's scholarly work, research, or ideas, to the scrutiny of experts in the same field to encourage authors to meet high standards and to control the dissemination of research data to ensure that unwarranted claims, unacceptable interpretations or personal views are not published without prior expert review. In the scientific community, peer review is an essential component of the academic writing process ensuring that papers published in scientific journals answer meaningful research questions and draw accurate conclusions from professional experimentation.[6] "The major advantage … is that peer-reviewed articles provide a trusted form of scientific communication."[7]

---

3     See generally Fed.R.Evid. 807
4     Fed. R. Evid. 807 advisory committee's note ("[t]his clarifies that a court assessing guarantees of trustworthiness may consider whether the statement is a 'near-miss' of one of the Rule 803 or 804 exceptions. If the court employs a 'near-miss' analysis it should—in addition to evaluating all relevant guarantees of trustworthiness—take into account the reasons that the hearsay misses the admissibility requirements of the standard exception.")
5     *Id.*
6     Peer Review in Scientific Publications: Benefits, Critiques, & A Survival Guide. *The electronic Journal of the International Federation of Clinical Chemistry and Laboratory Medicine*, (2014 Oct. 24), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4975196, Accessed May 6, 2020
7     *Id.*

A peer-reviewed article published in a reliable medical or scientific journal is "[a] treatise is written primarily and impartially for professionals, subject to scrutiny and exposure for inaccuracy, with the reputation of the writer at stake."[8] Peer review has been endorsed by the Supreme Court as one possible test to admit a scientific theory or technique into evidence. See *Daubert v. Merrell Dow Pharmaceuticals*, Inc., 113 S. Ct. 2786, 2800 (1993)("Many considerations will bear on the inquiry, including … <u>whether it has been subjected to peer review and publication</u> … and whether it has attracted widespread acceptance within a relevant scientific community. The inquiry is a flexible one, and its focus must be solely on principles and methodology, not on the conclusions that they generate.")(emphasis added); see also *Reilly v. Pinkus*, 338 U.S. 269, 275–76 (1949)(finding that the lower courts erred in preventing respondent from cross-examining medical expert witnesses with information from outside medical texts).

## II. REQUEST FOR JUDICIAL NOTICE

Plaintiff requests the Court to take judicial notice of the following sources whose accuracy cannot reasonably be questioned:

**A.  Judicial Notice Of Adjudicative Facts From Learned Treatises**

**1.  medRxiv**

"[A] free online archive and distribution server for complete but unpublished manuscripts (preprints) in the medical, clinical, and related health sciences … founded by Cold Spring Harbor Laboratory (CSHL), a not-for-profit research and educational institution, Yale University, and BMJ, a global healthcare knowledge provider. The server is owned and operated by CSHL." (https://www.medrxiv.org/content/about-medrxiv, Accessed May 6, 2020)

**2.  Stanford University Covid-19 Antibody Study**

In a study conducted by researchers from the Stanford University Medical School

---

[8]  See Fed. R. Evid. 803 advisory committee's note

and published April 11, 2020 as a research letter in the peer-reviewed Journal of the American Medical Association, 3,330 persons in Santa Clara County, California, were tested for evidence of Covid-19 infection. Based upon these tests, the researchers concluded that between 48,000 and 81,000 people in the county had been infected, corresponding to an estimated Covid-19 "infection fatality rate of 0.17%." *See* Comp. Ex. 6 (*COVID-19 Antibody Seroprevalence in Santa Clara County, California)*(emphasis added).[9]

### 3. Stanford University Mortality Risk Study

In another recent study from Stanford University medical school, researchers found that "[p]eople <65 years old have *very small risks* of COVID-19 death even in the hotbeds of the pandemic" and "deaths for people <65 years without underlying predisposing conditions are **remarkably uncommon**." *See* Ex. A (*Population-level COVID-19 mortality risk for non-elderly individuals overall and for nonelderly individuals without underlying diseases in pandemic epicenters.* Department of Medicine, and Department of Epidemiology and Population Health, Stanford University School of Medicine. (April 8, 2020); pre-publication submitted for peer-review) (emphasis added).[10]

### 4. Lancet Mortality Risk Study

In a Covid-19 mortality study conducted at the Imperial College London[11] and published March 30, 2020 in the highly-prestigious[12] peer-reviewed Lancet Infectious Diseases journal, researchers found that after "adjusting for demography and under-

---

9  https://www.medrxiv.org/content/10.1101/2020.04.14.20062463v2.full.pdf, Accessed May 6, 2020.
10  https://www.medrxiv.org/content/10.1101/2020.04.05.20054361v1.full.pdf, Accessed May 6, 2020.
11  MRC Centre for Global Infectious Disease Analysis, Abdul Latif Jameel Institute for Disease and Emergency Analytics, and Department of Infectious Disease Epidemiology, London, UK
12  The Lancet Infectious Diseases journal ranks first among infectious diseases journals (2018 Journal Citation Reports, Clarivate Analytics 2019); See also https://www.thelancet.com/laninf/about, Accessed May 6, 2020.

ascertainment, <u>we obtained a best estimate of the case fatality ratio [of] 0.32% in those aged <60 years vs 6.4% in those aged ≥60 years, and up to 13.4% in those aged 80 years or older.</u> Estimates of case fatality ratio from international cases stratified by age were consistent with those from China" at 1.4%. *See* Ex. B (Verity, Robert et. al, *Estimates of the severity of coronavirus disease 2019: a model-based analysis.* Lancet Infect Dis 2020 Published Online March 30, 2020 https://doi.org/10.1016/S1473-3099(20)30243-7 (emphasis added).[13]

### 5. Diamond Princess Cruise Ship Study

In a study of fatal Covid-19 infections aboard a cruise ship, researchers from the Department of Infectious Disease Epidemiology at the London School of Hygiene and Tropical Medicine reported <u>an overall infection fatality rate of 0.5%</u>. *See* Ex. C (Russell, Timothy W. et. al, *Estimating the infection and case fatality ratio for COVID-19 using age-adjusted data from the outbreak on the Diamond Princess cruise ship.* (March 9, 2020)(pre-publication submitted for peer review)(emphasis added).[14]

### 6. Methylpredisone: 34% Reduction In Respiratory Failure Deaths

In a peer-reviewed study published in the Journal of the American Medical Association, researchers found that in patients infected with Covid-19 with acute respiratory distress syndrome, ("ARDS"), "among the patients with ARDS, of those who received methylprednisolone treatment, 23 of 50 (46.0%) patients died, while of those who did not receive methylprednisolone treatment, 21 of 34 (61.8%) died. <u>The administration of methylprednisolone appears to have reduced the risk of death [by 34.3%] in patients with ARDS.</u>" *See* Ex. D (Wu C, Chen X, Cai Y, et al. *Risk Factors Associated With Acute Respiratory Distress Syndrome and Death in Patients With*

---

[13] https://www.thelancet.com/action/showPdf?pii=S1473-3099%2820%2930243-7, Accessed May 6, 2020.
[14] https://www.medrxiv.org/content/10.1101/2020.03.05.20031773v2.full.pdf, Accessed May 6, 2020.

*Coronavirus Disease 2019 Pneumonia in Wuhan, China.* JAMA Intern Med., Published online March 13, 2020)(emphasis added). [15]

### 7. <u>Peer-Reviewed</u> Published H1N1 ("Swine Flu") Mortality Data

In 2009, researchers from the French Institute for Public Health Surveillance[16] published the results of their study on H1N1 influenza infection, which found that <u>the overall mortality rate was 0.6%</u> and varied from 0.1% to 5.1%, depending on the country. *See* Ex. E (Vaillant L, et. al, *Epidemiology of fatal cases associated with pandemic H1N1 influenza 2009*. Euro Surveill. 2009;14(33):pii=19309. https://doi.org/10.2807/ese.14.33.19309-en Received: 07 Aug 2009)(emphasis added).[17]

### 8. Plague Mortality Rate

In a review article published 2015 in the CDC's peer-reviewed monthly journal Emerging Infectious Diseases, researchers reported that the overall mortality rate for plague (including bubonic) was a *minimum* of 16% to a maximum of 66%, with wide variations attributable largely to to racial and socioeconomic factors. *See* Ex. F (Kugeler, Kiersten J. et. al, *Epidemiology of Human Plague in the United States, 1900–2012*, Emerging Infectious Diseases Vol. 21, No. 1, January 2015)[18]

### 9. Smallpox Mortality Rate

Smallpox has an overall mortality rate of 30%. (*Scientific and Policy Considerations in Developing Smallpox Vaccination Options: A Workshop Report.* Institute of Medicine (US) Board on Health Promotion and Disease Prevention. Washington (DC): Nat. Acad. Press (US); 2002.)[19]

---

15 https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2763184, Accessed May 6, 2020. The researchers additionally found that the median age at fatality was 68.5 years and that in 36.5% and 25.0% of the fatalities hypertension or diabetes were present, respectively.
16 Institut de Veille Sanitaire, St Maurice, France
17 https://www.eurosurveillance.org/content/10.2807/ese.14.33.19309-en, Accessed May 6, 2020.
18 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4285253/pdf/14-0564.pdf, Accessed May 6, 2020.
19 https://www.ncbi.nlm.nih.gov/books/NBK221063/, Accessed May 6, 2020.

**10. Hemorrhagic Fever (e.g. Ebola) Mortality Rate**

In a 2016 study published in the peer-reviewed Open Virology Journal, it was reported that the ebola virus, which causes hemorrhagic fever, is up to 90% fatal. *See* Ex. G (Cobo, F. *Viruses Causing Hemorrhagic Fever. Safety Laboratory Procedures*. Open Virol J. 2016; 10: 1–9)[20]

**B.     Judicial Notice Of Adjudicative Facts From Public Documents**

**1.     USC-L.A. County Health Department Covid-19 Antibody Study**

Researchers from the University of Southern California in cooperation with the Los Angeles County Public Health Department conducted a Covid-19 antibody study where they found that approximately <u>2.8% to 5.6% of the county's adult population has antibody to the virus – approximately 221,000 to 442,000 adults.</u> This is 28 to 55 times higher than the 7,994 confirmed cases of COVID-19 reported to the county by the time of the study in early April. At the time of the study the "number of COVID-related deaths in the county has now surpassed 600." *See* Comp. Ex. 5 (*USC-LA County Study: Early Results of Antibody Testing Suggest Number of COVID-19 Infections Far Exceeds Number of Confirmed Cases in Los Angeles County Los Angeles* (April 20, 2020) (emphasis added).[21]

**2.     CDC Covid-19 Diagnostic Criteria: "What is a COVID-19 case?"**

"CDC U.S. COVID-19 case counts and death counts include <u>both confirmed and *probable* cases and deaths.</u> This change was made to reflect an interim COVID-19 position statement … issued by the Council for State and Territorial Epidemiologists [CSTE] <u>on April 5, 2020.</u> The position statement included a case definition and made COVID-19 a nationally notifiable disease." *See* Comp. Ex. 3 (emphasis added)[22]

---

20     https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4780467, Accessed May 6, 2020.
21     publichealth.lacounty.gov/phcommon/public/media/mediapubhpdetail.cfm?prid=2328, Accessed May 6, 2020.
22     See also  https://www.cdc.gov/coronavirus/2019-ncov/covid-data/faq-surveillance.html, Accessed May 6, 2020.

9

Plaintiff's Motion For Judicial Notice With Supporting Memorandum (3:20-cv-08081-GMS)

### a. CSTE Position Statement For Covid-19 "Confirmed" Diagnosis

The CSTE position statement for Covid-19 "confirmed" case diagnosis is that the case: "Meets clinical criteria AND epidemiologic evidence <u>with no confirmatory laboratory testing performed</u> for COVID-19." *See* Comp. Ex. 3 (*Standardized Surveillance Case Definition and National Notification for 2019 Novel Coronavirus Disease (COVID-19)*, Council of State and Territorial Epidemiologists (2020) (Added 4/24/2020))(emphasis added).[23]

#### i. Clinical Criteria

"At least <u>two</u> of the following symptoms: fever (measured or subjective), chills, rigors, myalgia, headache, sore throat, new olfactory and taste disorder(s) OR [a]t least one of the following symptoms: cough, shortness of breath, or difficulty breathing OR [s]evere respiratory illness with at least one of the following: [c]linical or radiographic evidence of pneumonia, or [a]cute respiratory distress syndrome (ARDS). AND No alternative more likely diagnosis."(emphasis in original).[24]

#### ii. Epidemiologic Linkage

"One or more of the following exposures in the 14 days before onset of symptoms: Close contact[25] with a confirmed or probable case of COVID-19 disease; or Close contact with a person with: clinically compatible illness AND linkage to a confirmed case of COVID-19 disease. <u>Travel to or residence in an area with sustained, ongoing community transmission</u> of SARS-CoV-2. Member of a risk cohort as defined by public health authorities during an outbreak."(emphasis added).[26]

---

[23] https://cdn.ymaws.com/www.cste.org/resource/resmgr/2020ps/interim-20-id-01_covid-19.pdf, Accessed May 6, 2020
[24] *Id.*
[25] *Id.* ("Close contact is defined as being within 6 feet for at least a period of 10 minutes to 30 minutes or more depending upon the exposure. In healthcare settings, this may be defined as exposures of greater than a few minutes or more. Data are insufficient to precisely define the duration of exposure that constitutes prolonged exposure and thus a close contact.")
[26] *Id.*

### 3. "Confirmed" Covid-19 Cases In Arizona (By Day)

On April 6, 2020, subsequent to the updated Covid-19 "diagnostic criteria" from the CDC, Arizona experienced an immediate, dramatic, and sustained increase in Covid-19 "confirmed cases." *See* Ex. H (*Confirmed COVID-19 Cases by Day*, Covid-19 Dashboard. Arizona Dept. of Health Services)[27]

## C. Judicial Notice Of Adjudicative Facts From Publicly-Available Documents

### 1. University Of Bonn Covid-19 Infection Fatality Rate Study

Researchers from the University of Bonn in Germany found a 0.37% Covid-19 mortality rate. *See* Ex. I (*Infection fatality rate of SARS-CoV-2 infection in a German community with a super-spreading event*, Institute of Virology, University Hospital, University of Bonn, Germany)[28] This is 17.4 and 18.6 times lower than the Covid-19 mortality rates reported by the CDC (5.9%)[29] and WHO (6.9%),[30] respectively.

## III. CONCLUSION

The Court should grant this Motion and take judicial notice of the existence of these documents and the adjudicative facts contained therein, such that the accuracy and authenticity of these sources cannot reasonably be questioned.

Dated:  May 7, 2020

Respectfully Submitted,

 */s/ Joseph M. McGhee*
Joseph Martin McGhee
Plaintiff, *in Pro Per*

---

[27] https://www.azdhs.gov/preparedness/epidemiology-disease-control/infectious-disease-epidemiology/covid-19/dashboards/index.php, Accessed May 6, 2020.
[28] https://www.ukbonn.de/C12582D3002FD21D/vwLookupDownloads/Streeck_et_al_Infection_fatality_rate_of_SARS_CoV_2_infection2.pdf/$FILE/Streeck_et_al_Infection_fatality_rate_of_SARS_CoV_2_infection2.pdf, Accessed May 6, 2020.
[29] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html, Accessed May 6, 2020
[30] https://covid19.who.int, Accessed May 6, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of May 2020, I caused the foregoing document to be filed electronically with the Clerk of Court through the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system. I further certify that some of the participants in the case are not registered CM/ECF users and that I have e-mailed the foregoing document to that user this same day and the document will be mailed the 7$^h$ day of May 2020.

>Michele Molinario
>Derek R. Graffious
>JONES, SKELTON & HOCHULI, P.L.C.
>40 North Central Avenue, Suite 2700
>Phoenix, Arizona 85004
>Telephone: (602) 263-1700
>Fax: (602) 200-7831
>mmolinario@jshfirm.com
>dgraffious@jshfirm.com
>
>*Attorneys for Defendants City of Flagstaff
>and Mayor Coral Evans*
>
>Brett W. Johnson (#021527)
>Colin P. Ahler (#023879)
>Tracy A. Olson (#034616)
>SNELL & WILMER L.L.P.
>One Arizona Center
>400 E. Van Buren, Suite 1900
>Phoenix, Arizona 85004-2202
>Telephone: 602.382.6000
>Facsimile: 602.382.6070
>bwjohnson@swlaw.com
>cahler@swlaw.com
>
>Anni L. Foster (#023643)
>General Counsel
>Office of Arizona Governor Douglas A. Ducey
>1700 West Washington Street
>Phoenix, Arizona 85007
>Telephone: 602-542-4331
>afoster@az.gov
>
>*Attorneys for Defendant Douglas A. Ducey,
>Governor of the State of Arizona*

/s/ *Joseph M. McGhee*

12
Plaintiff's Motion For Judicial Notice With Supporting Memorandum (3:20-cv-08081-GMS)